**SO ORDERED.**

**SIGNED this 29th day of September, 2023.**



_Mitchell L. Herren_
Mitchell L. Herren
United States Bankruptcy Judge

---

**DESIGNATED FOR ONLINE PUBLICATION**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

IN RE:

**DANIEL BERTRAM ACOSTA**

        Debtor.

**Case No. 22-10158**
**Chapter 7**

---

**LEA ANN LAVIELLE, MICHAEL
LAVIELLE, individually and on
behalf of minor child D.L.,
HAYDEN LAVIELLE BOALDIN,
ABBIGAIL LAVIELLE**

        Plaintiffs,

vs.

**DANIEL BERTRAM ACOSTA**

        Defendant.

**Adv. No. 22-5015**

<u>**MEMORANDUM OPINION**</u>

A primary motivation of most individual debtors filing bankruptcy is obtaining a bankruptcy "discharge." This discharge is, in essence, legal forgiveness from personal liability for certain debts. It is the cornerstone of what is often described as a bankruptcy system designed to provide a "fresh start" to the "honest but unfortunate debtor."[1]

However, for public policy reasons, some debts are not dischargeable. One such category of debts "excepted" from discharge is debt incurred due to wrongful conduct of the debtor.[2] Specifically, one type is described in § 523(a)(6) of the Bankruptcy Code[3] as "willful and malicious injury by the debtor."

A creditor who believes a debtor is seeking to discharge a debt incurred because of willful and malicious conduct can file a lawsuit known as an adversary proceeding in the debtor's bankruptcy case, asking the court to except the debt from the debtor's bankruptcy discharge. Plaintiffs Lea Ann and Michael Lavielle and their three children[4] filed such an adversary proceeding against debtor Daniel

---

[1] *Grogan v. Garner*, 498 U.S. 279, 287-88 (1991) (internal quotations omitted).

[2] 11 U.S.C. § 523(a) (delineating exceptions to discharge); *Grogan*, 498 U.S. at 287 (acknowledging the "'fresh start' policy" of the Bankruptcy Code but balancing that fresh start objective with "protecting victims" from the behaviors outlined in the nondischargeability provisions); *see also Glencove Holdings, LLC v. Bloom (In re Bloom)*, 622 B.R. 366, 374 (Bankr. D. Colo. 2020) (recognizing "fresh start" objective of bankruptcy but noting "[t]hose few debtors who engage in pre-bankruptcy dishonesty must continue to bear responsibility for the damages resulting from their misconduct"); *Burris v. Burris (In re Burris)*, 598 B.R. 315, 333 (Bankr. W.D. Okla. 2019) ("Many of the provisions in Section 523(a) aim to prevent discharge of debts involving a debtor's unacceptable conduct, such as dishonesty, fraud, or intentional injury.").

[3] All future statutory references in text, unless otherwise noted, are to Title 11 of the United States Code (the "Bankruptcy Code").

[4] The Court will hereafter refer to the Lavielles as the "Plaintiffs," and will refer to each Plaintiff individually by first name or initials. Mr. Acosta will be referred to as Defendant, or Acosta.

Bertram Acosta, seeking to prevent his discharge of a debt arising from a 2017 judgment the Plaintiffs obtained after a federal court jury in Oklahoma (the Oklahoma case) found Acosta civilly liable for outrageous conduct in stalking and harassing Plaintiffs.

It is this Court's responsibility to determine if Plaintiffs have proven their claim under bankruptcy law that Defendant's debt resulted from willful and malicious injury. The Court has reviewed the history of state and federal court orders, the Oklahoma case trial transcript and exhibits, and conducted a bench trial. Deciding whether a debtor's conduct was willful and malicious can sometimes be a close call. This was not such a case.

This Court concludes the evidence supports a finding the judgment debt resulted from willful and malicious injuries by Acosta. For the reasons discussed below,[5] the Court finds judgment should be entered for Plaintiffs, declaring the debt nondischargeable under § 523(a)(6).

### A. <u>Judicial Notice of Prior Proceedings</u>

The judgment in the Oklahoma case[6] was entered after a jury trial at which Plaintiffs and Defendant were represented by counsel and testified. In the Tenth Circuit, a court may, but is not obligated to, take judicial notice of publicly filed records in other courts concerning matters that bear directly upon the disposition of

---

[5] The discussion following will comprise this Court's findings of facts and conclusions of law, pursuant to Fed. R. Bankr. P. 7052.
[6] Civil Case No. 5:16-cv-01002-R (W.D. Okla.), affirmed on appeal in Tenth Circuit Case No. 18-6041.

3

the current case.[7] The Court advised the parties multiple times prior to trial it

would take judicial notice of the exhibits and transcripts, and all parties consented.[8]

The Court therefore takes judicial notice of the exhibits and transcripts from the

Oklahoma case as well as the other court proceedings referenced in this

memorandum. [9]

---

[7] *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007); *St. Louis Baptist Temple v. Fed. Deposit Ins. Corp.*, 605 F.3d 1169, 1172 (10th Cir. 1979) (explaining the key inquiry to take judicial notice of other court proceedings is whether those proceedings directly relate to the matters at issue). *See, e.g.*, *Swan Pediatric Dental, LLC v. Hulse (In re Hulse)*, No. UT-22-001, 2022 WL 16826561, at *6 n.46 (10th Cir. BAP Nov. 8, 2022) (taking judicial notice of a summary judgment transcript from the underlying bankruptcy docket on appeal of a § 523(a)(6) action); *Cont'l Coal Inc. v. Cunningham*, 511 F. Supp. 2d 1065, 1071 (D. Kan. 2007) (taking judicial notice of pleadings, court orders, motions, and certified transcripts of hearings from the state court case).

[8] Adv. No. 22-5015 (Bankr. D. Kan.), Doc. 47 (order denying Plaintiffs' motion for judgment on the pleadings; instructing the parties they would have an opportunity to present evidence at trial and that the Court would give "appropriate consideration" to the record from the Oklahoma case); Doc. 51 (February 9, 2023 court room minute sheet; informing parties the Court would take judicial notice of the transcript and admitted exhibits from the Oklahoma case and all parties expressly consenting thereto); Doc. 53 (hearing scheduling order discussing use of exhibits from Oklahoma case); Doc. 69 (order denying the parties' cross-motions for summary judgment; instructing parties the Court would "consider and weigh the evidence presented in the Oklahoma trial by taking judicial notice of the complete trial transcript and admitted trial exhibits" and any other testimony and admissible evidence presented at trial of the § 523(a)(6) claim); Doc. 71 (June 9, 2023 final pretrial conference; instructing the Court would take judicial notice of the trial transcript and admitted exhibits from the Oklahoma case and the entire "court record resulting from the Oklahoma case"); Doc. 79 (final pretrial order; same notice that Court would take judicial notice of the Oklahoma case trial transcripts and admitted exhibits).

[9] In this Opinion, the Court will discuss and cite documents from multiple judicial proceedings (*e.g.*, the Oklahoma case, the appeal of the Oklahoma case to the Tenth Circuit, and the pleadings filed in the adversary proceeding and underlying bankruptcy case in this Court, among others). When citing documents from these cases, where possible the Court will identify the case number, court, and then docket number of each relevant document.

4

## B.    **Procedural History**

*1.    First Protection Order: 2004 to 2008*

The history between the parties began long before the late 2017 Oklahoma judgment. On June 19, 2008, Lea Ann, on behalf of herself and her then-minor children (Hayden, Abbigail, and D.L.), filed a petition for protection from stalking against Acosta in Morton County, Kansas state court.[10] Such petitions are governed by the Kansas Protection from Stalking Act.[11] Under this Act, stalking is defined as "an intentional harassment of another person that places the other person in reasonable fear for that person's safety."[12]

In the petition, Lea Ann complained of four years of stalking behavior from Acosta, who she indicated lived across the street from her family in Elkhart, Kansas, that had gotten "progressively more invasive," including staring at Lea Ann while she loaded her children in her car, sitting in her alley and looking in her windows, and "thrust[ing] his cro[t]ch" at her.[13] At the trial in the Oklahoma case, Lea Ann testified regarding Acosta's behavior during this time period: she saw Acosta sitting in his car in the alley behind her home staring at her through her kitchen window,[14] and received phone calls while her husband was away that initially were nothing but "heavy panting" but then progressed to speaking calls,

---

[10] Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Trial Exh. 27.
[11] Kan. Stat. Ann. § 60-31a01 et seq.
[12] *Id.* § 60-31a02.
[13] Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Trial Exh. 27 p. 4-6.
[14] *Id.*, Doc. 125 (Tr. 53:18-54:6).

5

saying things like "I know you're home alone" and "are you sure your kids are in their bed."[15]

On July 16, 2008, the Morton County, Kansas state court entered a Protective Order granting Lea Ann's petition ("First Protection Order"), concluding Acosta's stalking was proven by a preponderance of the evidence.[16] Acosta was ordered not to "follow, harass, telephone, contact or otherwise communicate" with Lea Ann or her children,[17] and ordered to "not direct any contact with" Lea Ann or her children "by staring in [the] direction" of them or their home.[18] Acosta appeared in the proceeding and was represented by counsel.[19]

### 2. Second Protection Order: 2008 to 2012

On July 16, 2012, Lea Ann filed a second petition for protection from stalking against Acosta, again in Morton County, Kansas state court.[20] In this second petition, Lea Ann stated Acosta had "previously tried to force his way into" the family's home, harassed her, frequently sat in his vehicle and stared at her, repeatedly drove by her "revving" his engine while she was in town, and had "gotten progressively more aggressive."[21] Lea Ann also reported an incident where someone broke into her home and stole her undergarments and "some that looked just like

---

[15] *Id.* (Tr. 54:12-22).
[16] *Id.*, Trial Exh. 28.
[17] *Id.*
[18] *Id.* p. 31.
[19] *Id.* p. 30. The First Protection Order expired after one year. *Id.*
[20] *Id.*, Trial Exh. 29.
[21] *Id.* p. 4.

**6**

them showed up hanging on [Acosta's] fence a few days later."[22] She also reported feeling "scared," "violated," "helpless," and "vulnerable."[23]

At the trial in the Oklahoma case, Lea Ann also testified regarding the incidents during this time period: Acosta shoved open the cracked front door of the family's home, knocking Hayden over and scaring both Hayden and Lea Ann,[24] Acosta made aggressive phone calls saying things like "Can you imagine the things I could do to you," "I know your husband is not home," and "I know what you're wearing,"[25] and Acosta would watch Lea Ann leave the house and follow her around town.[26] She further explained that the undergarments she saw hanging on Acosta's fence shortly after the break-in at her house were special, matching sets she had recently purchased and had described in detail to the police officers making the police report.[27]

On October 10, 2012, a second Order for Protection from Stalking was entered ("Second Protection Order") by the District Court of Morton County, Kansas.[28] Again, Acosta appeared in the proceeding and was represented by counsel, and again, the Second Protection Order concluded Lea Ann "proved the allegations of [s]talking by a preponderance of the evidence."[29] Acosta was again ordered to "not follow, harass, telephone, contact, or otherwise communicate" with

---

[22] *Id.* p. 7.
[23] *Id.*
[24] *Id.*, Doc. 125 (Tr. 57:20-59:14).
[25] *Id.* (Tr. 69:16-70:11).
[26] *Id.* (Tr. 70:14-22).
[27] *Id.* (Tr. 67:3-25).
[28] *Id.*, Trial Exh. 30.
[29] *Id.*

7

Lea Ann,[30] was ordered to not interfere with Lea Ann's privacy rights, and was ordered to stay away from both Lea Ann's residence and workplace.[31]

### 3. Third Protection Order: 2012 to 2015

At the trial in the Oklahoma case, Lea Ann explained that Acosta's behavior got worse after the Second Protection Order was entered, not better.[32] The incidents Lea Ann described were almost too numerous to list. By way of example, Lea Ann said Acosta would make gestures toward the family "like he was slitting his throat" and "hold his hand up like a gun,"[33] repeatedly exposed himself to them,[34] shone a spotlight into their bedrooms at night when Michael was working away from the home,[35] frequently swerved his car at them,[36] and installed cameras facing Plaintiffs' home and windows.[37]

After entry of the Second Protection Order, Plaintiffs also received notice of three allegations of abuse against them filed with the Kansas Department for Children and Families. All three were unsubstantiated: the first in October 2012, shortly after the Second Protection Order was entered,[38] the second in October

---

[30] *Id.*

[31] *Id.* p. 33 ("shall not enter, come on or around the premises, the residence or the workplace where [Lea Ann] resides, stays or works"). The Second Protection Order also expired after one year. *Id.*

[32] *Id.*, Doc. 125 (Tr. 76:16-18).

[33] *Id.* (Tr. 70:16-22).

[34] *Id.* (Tr. 70:23-71:10).

[35] *Id.* (Tr. 72:3-16).

[36] *Id.* (Tr. 74:8-75:6). In one incident, Abbigail testified that she and Hayden and a cousin were roller skating outside and Acosta approached in his car, speeding up as he got near, forcing her to jump out of the way. *Id.*, Doc. 126 (Tr. 264:14-266:9).

[37] *Id.*, Doc. 125 (Tr. 78:16-79:11).

[38] *Id.*, Trial Exh. 24.

8

2014,[39] and the third in June 2015.[40] Acosta admitted at trial in the Oklahoma case to making all the allegations of abuse.[41]

The testimony at trial in the Oklahoma case also revealed that in early September 2015, there were escalating incidents between Acosta and Plaintiffs. Lea Ann testified that on September 1, 2015, she looked out her window to watch for guests to arrive at her home and made eye contact with Acosta who was sitting in his vehicle across the street. Lea Ann saw Acosta then pick up a knife and start twirling it and then point it at Lea Ann multiple times.[42] Michael and Lea Ann related that a few days later, Michael was in his front yard when Acosta waved a knife and screamed at him, and then chased the family to the police department.[43] After this incident, Plaintiffs decided to leave their home and move to Oklahoma.[44]

On December 21, 2015, Plaintiffs filed a third petition seeking protection from stalking from Acosta, and a third Order of Protection from Stalking was entered on January 12, 2016 by the District Court of Morton County, Kansas

---

[39] *Id.*, Trial Exh. 25.
[40] *Id.*, Trial Exh. 26.
   In June 2015, Acosta was arrested for making criminal threats against two local women, unrelated to Plaintiffs. *Kansas v. Acosta*, Case No. 11-CR-74 (Kan.) Ultimately, those charges were dismissed, and Acosta filed a federal court lawsuit against the Morton County, Kansas Sheriff's Department and an individual officer for false arrest and violation of his civil rights. *Acosta v. Morton County Sheriff's Dep't*, No. 15-1375-EFM-KGG (D. Kan.). The civil rights case was dismissed on stipulation of the parties. *Id.*, Docs. 24-25. Lea Ann testified that she was aware of Acosta's arrest, and it coincided with his behavior becoming "more bold" and "escalating"—she feared Acosta "was going to hurt someone and it was probably going to be . . . one of my family members just because we were in close proximity." Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 125 (Tr. 120:16-121:4).
[41] *Id.*, Doc. 126 (Tr. 342:17-346:19).
[42] *Id.*, Doc. 125:22-126:24).
[43] *Id.*, Doc. 126 (Tr. 391:12-397:25); *Id.*, Doc. 125 (Tr. 127: 4-129: 22).
[44] *Id.*, Doc. 126 (Tr. 398:13-21); *Id.*, Doc. 125 (Tr. 130:9-131:3).

9

("Third Protection Order").[45] This Third Protection Order was entered against Acosta on behalf of all Plaintiffs, and for a third time the state court concluded Plaintiffs proved the allegations of stalking by Acosta by a preponderance of the evidence.[46] Like before, Acosta was ordered to not follow, harass, or contact Plaintiffs, and avoid Plaintiffs' residence and workplaces.[47] As before, the incidents with Acosta did not stop after entry of the protection order.[48]

    4.    *Filing and Trial of the Oklahoma Case: 2016 to 2017*

On August 30, 2016, Plaintiffs filed a complaint against Acosta in the U.S. District Court, Western District of Oklahoma, seeking actual and punitive damages and injunctive relief.[49] Acosta appeared in the Oklahoma case with counsel and filed

---

[45] *Id.*, Trial Exh. 31. At the Oklahoma trial, Plaintiffs testified to two incidents in late 2015 that preceded the third request for a protection from stalking order, one in October 2015 and one in December 2015, both when they had been visiting or getting items from their home in Kansas. During the October 2015 incident, Lea Ann described how Acosta ran toward them, then returned to his vehicle and pointed what they believed to be a gun at them. *Id.*, Doc. 125 (Tr. 133:9-134:8). During the December 2015 incident, Lea Ann testified her children reported Acosta "pulled a gun" on Abbigail. *Id.* (Tr. 134:9-135:22); *see also Id.*, Doc. 126 (Tr. 262:15-264:13) (Abbigail testimony regarding December 2015 incident); *Id.* (Tr. 275:14-276:12) (D.L. testimony regarding December 2015 incident).

[46] *Id.*, Trial Exh. 31.

[47] *Id.*

[48] *E.g.*, *Id.*, Doc. 125 (Tr. 137:5-9) (Lea Ann testimony that Acosta did not comply with Third Protective Order); *Id.* (Tr. 141:13-142:12) (Lea Ann testimony concerning Acosta chasing and following Hayden and grandmother while Hayden in Elkhart at "the old house"); *Id.*, Doc. 126 (Tr. 233:15-234:14) (Hayden testimony about returning to Elkhart and Acosta chasing her and grandmother through town); *Id.* (Tr. 401:3-403:22) (Michael testimony about Acosta closely following Plaintiffs' vehicle into Oklahoma); *Id.* (Tr. 276:13-23) (D.L. testimony about incident wherein Acosta "chased us in Oklahoma").

[49] *Id.*, Doc. 1 (complaint).

10

counterclaims for malicious prosecution, assault, trespass, harassment, and stalking, and also sought actual and punitive damages and injunctive relief.[50]

Ultimately, the parties proceeded to trial in Oklahoma in November of 2017 solely on a claim from Plaintiffs against Acosta for the tort of outrageous conduct causing severe emotional distress, and one counterclaim by Acosta against Michael for the same tort.[51] The jury was asked to decide liability and whether damages for noneconomic loss, economic loss, and punitive damages were appropriate.[52] The jury was instructed Plaintiffs had to prove "willful, wanton, or malicious" behavior by Acosta to award punitive damages.[53]

Regarding damages, Lea Ann testified that because of Acosta's behavior she lost weight, became depressed, confined herself in a spare room for about six weeks, rarely leaving, and then also attempted suicide.[54] Lea Ann came to feel so helpless as legal avenues failed to stop Acosta that she began to think that since she was the target of Acosta's "obsession," her best way to protect her children and husband was to take herself "out of the picture."[55] Lea Ann also described the impact on her

---

[50] *Id.*, Doc. 33 (amended answer, counterclaim). Summary judgment was entered for Plaintiffs on Acosta's malicious prosecution claim. *Id.* Doc. 61 (order granting motion for partial summary judgment; also at *Lavielle v. Acosta*, No. CIV-16-1002-R, 2017 WL 4399563 (W.D. Okla. Oct. 3, 2017).

[51] Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 80 (jury instructions). The Kansas tort of outrage is recognized in other jurisdictions as intentional infliction of emotional distress. These standards are based on the Restatement of Torts (Second) § 46(1) which provides: "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

[52] *Id.* p. 22-24 (jury instruction nos. 20 and 21).

[53] *Id.* p. 23 (jury instruction no. 21).

[54] *Id.*, Doc. 125 (Tr. 86:8-91:14); *Id.* (Tr. 95:18-96:6).

[55] *Id.* (Tr. 85:5-88:20).

11

children: at times saying they were "traumatized,"[56] "hysterical,"[57] and "scared of him and nervous."[58] Michael testified about his physical and emotional distress, but also about the financial stress his family endured because of their move away from Kansas and the loss of his business because of the move.[59]

The jury also heard from Dr. Gail Poyner, a forensic psychologist retained by Plaintiffs. Dr. Poyner testified to Plaintiffs' psychological harm and social harm.[60] Regarding Lea Ann, Dr. Poyner testified she had been psychologically harmed, the damage was "long-standing in nature," and Lea Ann would require psychotherapy.[61] Dr. Poyner's testimony and accompanying expert report supported this opinion with many examples of sexual and denigrating comments Acosta had made about women in general, and Lea Ann and other women he was accused of stalking in particular, in emails and Facebook posts he admitted to generating.[62] Dr. Poyner explained that Michael developed anxiety that "caused him emotional harm that could last for a significant amount of time."[63] Regarding the Lavielle children, Dr. Poyner observed that they showed fear, anxiety, and had been traumatized.[64]

---

[56] *Id.* (Tr. 100:11-15).
[57] *Id.* (Tr. 104:4-25).
[58] *Id.* (Tr. 105:21-106-8).
[59] *Id.*, Doc. 126 (Tr. 404:4-406:19).
[60] *Id.* (Tr. 445:3-446:7). Dr. Poyner's report accompanying her testimony is Trial Exhibit 101, introduced in this Court during Michael's testimony. *Id.*, Trial Exh. 101.
[61] *Id.*, Doc. 126 (Tr. 475:15-476:1).
[62] *Id.* (Tr. 449-81); Trial Exh. 101 pp. 7-8. Dr. Poyner testified about numerous e-mail messages Acosta sent to Plaintiffs' counsel in the Oklahoma case before Acosta was represented by an attorney, wherein Acosta denigrated and demeaned women. *Id.* Doc. 126 (Tr. 450:23-451:18) (referring to "derisive and denigrating and sexually inappropriate comments" reflecting his "world view of women"). The majority of his messages concerned Lea Ann. *Id.*, Doc. 127 (Tr. 514:14-515:12).
[63] *Id.*, Doc. 126 (Tr. 476:2-477:5).
[64] *Id.* (Tr. 477:6-478:16).

12

Finally, Acosta also testified at trial. He claimed Plaintiffs had lied and that he could not recall anything Lea Ann or the children had said that was true,[65] he accused Plaintiffs of harassing and stalking him,[66] accused Lea Ann and her children of putting on a show "for drama,"[67] accused Lea Ann of having mental problems,[68] and accused Lea Ann of "coaching" the children to testify against him.[69] Acosta's direct examination focused on his allegations that Lea Ann and Michael were instead harassing him.[70]

Acosta's testimony did not persuade the jury. The jury returned verdicts in favor of Plaintiffs and against Acosta on November 14, 2017.[71] Damages were awarded to Plaintiffs as follows:

|  | Noneconomic losses (past and future): | Economic loss (past): | Punitive damages: | Total award: |
|---|---|---|---|---|
| Lea Ann | $20,000[72] |  | $32,000[73] | $52,000 |
| Michael | $20,000[74] | $40,000[75] | $32,000[76] | $92,000 |
| Abbigail | $20,000[77] |  | $32,000[78] | $52,000 |

---

[65] *Id.* (Tr. 285:13-287:5).
[66] *Id.* (Tr. 287:6-16).
[67] *Id.* (Tr. 292:7-24).
[68] *Id.* (Tr. 299:4-301:24).
[69] *Id.* (Tr. 302:19-303:24).
[70] *Id.*, Doc. 127 (Tr. 541-557).
[71] *Id.*, Docs. 82-92 (jury verdicts).
[72] *Id.*, Doc. 82 (verdict form for Lea Ann).
[73] *Id.*, Doc. 88 (stage two verdict form for Lea Ann).
[74] *Id.*, Doc. 83 (verdict form for Michael).
[75] *Id.*
[76] *Id.*, Doc. 89 (stage two verdict form for Michael).
[77] *Id.*, Doc. 84 (verdict form for Abbigail).
[78] *Id.*, Doc. 92 (stage two verdict form for Abbigail).

| | | | |
|---|---|---|---|
| Hayden | $20,000[79] | | $32,000[80] | $52,000 |
| D.L. | $20,000[81] | | $32,000[82] | $52,000 |
| | | | | $300,000 |

Shortly after the jury found in their favor, Plaintiffs filed a motion in the same case for a permanent injunction and protective order against Acosta.[83] On December 12, 2017, the United States District Court entered an order granting Plaintiffs a permanent injunction, in the judge's words, in an effort to curtail Acosta's "campaign of harassment" against Plaintiffs.[84] The permanent injunction contained the following conclusions:

- The court found "there is a substantial threat of future harm to Plaintiffs if an injunction is not granted against Mr. Acosta."[85]

- After the trial resulting in verdicts against Acosta, there was evidence Acosta contacted Plaintiffs' expert witness to assert the witness lied, an anonymous caller to the Oklahoma Department of Human Services "falsely" reported Lea Ann testified at trial she was going to kill her husband and children, which was "consistent with testimony at trial that [Acosta] made calls to child welfare in Kansas regarding the Lavielles," and Acosta repeatedly drove past a store Plaintiffs were in and then followed them for miles.[86]

- Plaintiffs' harm they were seeking to avoid with the injunction was "their continued emotional degradation," which the court found "undoubtedly irreparable."[87]

---

[79] *Id.*, Doc. 85 (verdict form for Hayden).
[80] *Id.*, Doc. 91 (stage two verdict form for Hayden).
[81] *Id.*, Doc. 86 (verdict form for D.L.).
[82] *Id.*, Doc. 90 (stage two verdict form for D.L.).
[83] *Id.*, Doc. 95 (motion for permanent injunction and protective order).
[84] *Id.*, Doc. 102 (order); also at *Lavielle v. Acosta*, 281 F. Supp. 3d 1133 (W.D. Okla. 2017).
[85] Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 102 p. 2.
[86] *Id.*
[87] *Id.*

14

- "The Lavielles were driven from their home in Kansas because of [Acosta's] abusive tactics toward various members of the family, including the minor children."[88]

- Acosta was ordered, among other things, to have no contact with any of the Plaintiffs by any manner, not follow any Plaintiff, and not enter any property of the Plaintiffs.[89]

The next day, on December 13, 2017, judgment was entered for Plaintiffs in the above detailed amounts, plus interest at 1.66% per annum, along with costs.[90]

### 5. Post-Trial: 2018 to 2019

Acosta then motioned for a new trial, arguing an improper use of peremptory challenges during jury selection and that the damages awarded were not supported by the evidence.[91] In an order denying the motion, the court made the following commentary about the evidence:

> There was substantial testimony that Plaintiffs endured years of mental torment by Defendant, who continued to harass them despite the presence of protective orders issued by the state court. He made repeated calls to child welfare to lodge complaints about the Lavielle parents, none of which officials ever substantiated as true. When the state courts in Kansas chose not to enforce their protective orders, the family relocated to Oklahoma, although Defendant continued his attempts at harassment thereafter. In short, the individual members of the Lavielle family were subjected to Defendant's concerted effort to repeatedly disrupt their lives, and they testified as to the emotional distress they suffered, which the Court finds was extreme and outrageous. Furthermore, Michael Lavielle and his wife testified to the economic consequences of Defendant's actions. Construing the evidence in the light most favorable to the Plaintiffs, Defendant fails to meet his heavy burden of establishing that the verdict should not stand.[92]

---

[88] *Id.* p. 3.

[89] *Id.*

[90] *Id.*, Doc. 103 (judgment). Costs of $4856.32 were assessed. *Id.*, Doc. 111 (costs taxed).

[91] *Id.*, Doc. 107 (motion for new trial).

[92] *Id.*, Doc. 112 p. 5; also at *Lavielle v. Acosta*, No. CIV-16-1002-R, 2018 WL 992045 (W.D. Okla. Feb. 20, 2018).

15

It appears that at this point, Acosta began proceeding without an attorney in the Oklahoma case, and he appealed the judgment against him to the Tenth Circuit Court of Appeals.[93]

At about the same time he appealed, Acosta filed a new, pro se case against Lea Ann and Michael in the District Court for the District of Kansas ("Kansas federal case").[94] In the Kansas federal case, Acosta claimed he was being stalked and harassed by Lea Ann and Michael and that they pursued false legal claims against him, in violation of his civil rights.[95] In a report and recommendation issued April 4, 2018, the magistrate judge recommended dismissal of Acosta's complaint based on claim preclusion and frivolousness under 28 U.S.C. § 1915(e)(2)(B)(i).[96] Regarding frivolousness, the report and recommendation stated: "Without going so far as to find a violation of the injunction, in light of the prior case, the Court finds Mr. Acosta's current claims appear frivolous and malicious under § 1915(e)(2)(B)(i), and presented for the purpose of harassment and vexation of the Lavielles."[97] Mr. Acosta did not object to the report and recommendation, and on June 4, 2018, the District Court adopted it and dismissed the Kansas federal case.[98]

Meanwhile, at the Tenth Circuit in his appeal of the Oklahoma case, Acosta argued there was insufficient evidence to support the jury verdicts and that it was

---

[93] Civil Case No. 5:16-civ-01002-R (W.D. Okla.), Docs. 113 and 115 (notice of appeal).
[94] Civil Case No. 6:18-cv-01060-EFM-GEB (D. Kan.).
[95] *Id.*, Doc. 1 (complaint).
[96] *Id.*, Doc. 8 (report and recommendation).
[97] *Id.* p. 9.
[98] *Id.*, Doc. 10; also at *Acosta v. Lavielle*, No. 18-1060-EFM, 2018 WL 4492978 (D. Kan. 2018).

16

error to deny his motion for a new trial because of errors in awarding damages.[99] In an opinion issued January 14, 2019, the Tenth Circuit Court of Appeals affirmed the judgment against Acosta and the denial of his motion for a new trial.[100] The Tenth Circuit concluded Acosta failed to provide an adequate record on appeal for it to review his arguments.[101]

6. *Acosta's Bankruptcy and Plaintiffs' Adversary Proceeding: 2022 to 2023*

About two years passed. On March 15, 2022, Acosta filed a Chapter 7 bankruptcy petition.[102] Acosta listed only two debts on his bankruptcy schedules: a $6612 credit card debt and the judgment debt to Plaintiffs.[103] On June 8, 2022, Plaintiffs filed their adversary proceeding, objecting to the dischargeability of their judgment against Acosta under § 523(a)(6). All parties are without attorneys.

After briefing from the parties, the Court denied Plaintiffs' motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).[104] Plaintiffs argued that collateral estoppel (issue preclusion) established that the judgment from the Oklahoma case should be nondischargeable as a willful and malicious injury under § 523(a)(6). The Court analyzed the Kansas tort of outrage upon which the jury based its verdict, and concluded the tort could be based on intentional *or* reckless conduct, whereas nondischargeability under § 523(a)(6) requires a showing

---

[99] Tenth Circuit Case No. 18-6041.
[100] *Lavielle v. Acosta*, No. 18-6041, 748 F. App'x 196 (10th Cir. Jan. 14, 2019) (unpublished).
[101] *Id.* at 198.
[102] Bankr. Case No. 22-10158 (Bankr. D. Kan.).
[103] *Id.*, Doc. 1 p. 15-16.
[104] *Id.*, Doc. 47 (order denying Plaintiffs' motion for judgment on the pleadings). Rule 12(c) is made applicable to adversary proceedings via Fed. R. Bankr. P. 7012.

17

of an "'intentional act that leads to injury.'"[105] In addition, the standard for awarding punitive damages in Kansas is willful, wanton, or malicious behavior, but "wanton conduct can also be established on a showing of reckless disregard."[106] The Court concluded that because the judgment could have been based on a finding of reckless conduct, it could not conclude that collateral estoppel established that Acosta's actions were both willful and malicious under § 523(a)(6). The Court instructed the parties it would give them an opportunity to present evidence, and that it would give "appropriate consideration" to the record from the Oklahoma case.[107]

## C.    Trial on Plaintiffs' Complaint

The Court held a live trial in the summer of 2023. Plaintiffs all testified honestly and consistently, albeit with different presentations of their trauma and

---

[105] *Id.* p. 9 (quoting *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 911 (10th Cir. BAP 2020)). The elements required to prove Plaintiffs' tort of outrage were defined for the jury as follows:
>    1. The Defendant acted intentionally, or in reckless disregard of the particular Plaintiff;
>    2. the Defendant's conduct was extreme and outrageous;
>    3. the Defendant's conduct caused that particular Plaintiff's mental distress; and
>    4. That particular Plaintiff's mental distress was extreme and severe.

Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 80 p. 16 (jury instruction no. 14). *See also Dawson v. Assoc. Fin. Svs. Co.,* 215 Kan. 814, 820–22, 529 P.2d 104 (1974); *Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1183 (1986). The jury instructions also defined "recklessly or with intent," and the definition included conduct that was indifferent to harm, "although no harm was intended." Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 80 p. 18 (jury instruction no. 16).

[106] Adv. No. 22-5015 (Bankr. D. Kan.), Doc. 47 p. 10 (citing jury instructions from Oklahoma case).

[107] *Id.* p. 13. The Court also denied the parties' cross-motions for summary judgment, concluding neither party properly supported their motion with undisputed material facts sufficient to award judgment as a matter of law. *Id.* Doc. 69 p. 18-19 (order denying the parties' cross-motions for summary judgment).

18

fear. Michael's testimony was poised, but tearful at points. He testified about the protection from stalking orders entered in the Kansas state court, and the incidents from Acosta preceding entry of each order (e.g., "staring, parking, looking in windows, and obscene gestures" preceding the First Protective Order; "staring, forcing his way into our home, obscene gestures" preceding the Second Protective Order; "stalking" preceding the Third Protective Order). Michael described aspects of the progression and boldness of Acosta's stalking behavior, the number of years it was endured, a hospital visit after being "punched in the throat" by Acosta, his physical and emotional harm, being "forced to move" out of Kansas by Acosta, and his belief that the damages awarded to him in the Oklahoma case were based on willful and malicious injury by Acosta. This Court finds Michael was a credible and sincere witness.

Lea Ann then testified, although it was visibly difficult for her to do so. She was shaky, tearful, and emotional. She discussed various examples from fourteen years of harassment and torture by Acosta. She reported leaving their family home—leaving family and friends and taking their children from all they knew to "flee" the harassment from Acosta.[108] She described direct impacts to herself, her husband, and her children from Acosta's behavior. She talked about the repeated trauma of having to testify in front of multiple courts and judges, pleading for relief from Acosta's behavior. Her testimony was also credible—Lea Ann was sincere, thorough, and clear. She testified to many large and small things Acosta did that

---

[108] Lea Ann later testified that leaving the family home was an attempt to "escape" the daily stalking, aggravations, and stress from Acosta.

19

added up to years of terror, anxiety, interruption to her family time, and torture her family endured. She also testified that the damages awarded in the Oklahoma case were for the individual harms each Plaintiff suffered, but also how those damages related to the collective harm her family suffered.[109]

Hayden next testified. Hayden was calm and collected, but defiant. She remembered that from a young age she could recall Acosta making gestures such as slicing his throat, making gun shapes with his hands, and swerving his vehicle toward them when passing on roadways. She provided her perspective about the fear, abuse, and emotional damage done by Acosta to her family. Hayden remembered not being able to go to the pool as a child for fear Acosta would drive by and watch, being unable to go to the park because Acosta would sit and watch the children play, multiple incidents of what she perceived as Acosta trying to run over her with his vehicle, and having to leave the family home in Kansas. Hayden bluntly stated she was "robbed of her childhood" by Acosta. This Court finds her testimony, like that of her parents, to be credible and sincere. If anything, her descriptions of her experiences with Acosta were reserved and understated.

Finally, Abbigail testified. She was emotional and tearful, but also very credible. Abbigail explained that because of her fear of Acosta she never felt safe

---

[109] Regarding damages—i.e., her family's injuries—Lea Ann's testimony was comprehensive. Lea Ann testified that her family suffered nightmares, did not feel safe in their own home, her children were not allowed to play outside when Acosta's vehicle was around, her husband lost his business which caused financial stress, her family had to leave their home in Kansas, she and Michael had to pay for housing expenses in Oklahoma after leaving Kansas while simultaneously financing their Kansas home, her family did not feel safe at their Kansas home, her family had to leave their church family and support system, and her family had to leave their extended family in Kansas.

20

living in the family's home in Kansas. Like Hayden, she remembered that as a child she could not play outside when Acosta's vehicle was at home and could not go to the pool or the park. She said she kept a baseball bat beside her bed as a child in fear that Acosta would break into the home and harm her family. Abbigail recalled a Sunday school class at her church when she was seven or eight years old and her class was asked to draw pictures of the times they were most scared. Abbigail drew pictures of incidents with Acosta.[110] Abbigail disclosed that she suffers anxiety and night terrors due to Acosta's actions and talked about the continuing harm to her mental health. She said she still fears what Acosta will do to her family.

D.L., as a minor represented by his parents, did not testify. He appeared at the trial of the proceeding, however, and was visibly shaken when Acosta spoke. D.L. appeared to have difficulty at times maintaining his composure as others testified during the trial.

Acosta did not present any evidence or testimony at trial. He cross examined each of the testifying Plaintiffs, however, allowing the Court to observe his demeanor. Acosta was hostile, argumentative, and repeatedly interrupted Plaintiffs with argument and allegations of perjury, but never provided any actual evidence of any of his accusations.

---

[110] During cross examination, Abbigail was asked to list Acosta's actions that caused her to fear him and gave her anxiety. Abbigail listed gestures, Acosta driving by "constantly," flipping them off, hanging out his window at them, throwing his hands, cussing at them while standing across the street. Abbigail testified this behavior spanned fourteen years, beginning when she was a toddler, and that she did not remember a time when her family did not have problems with Acosta.

21

D. **Analysis**

1. *Jurisdiction and Presentation of Issue for Consideration*

The Court has jurisdiction over this nondischargeability adversary proceeding as a core proceeding arising under title 11.[111]

"Determining whether a debt is nondischargeable under § 523(a) is a two-step process."[112] A creditor must first show the existence of an enforceable claim, and then must show that "the debtor's debt for that claim is nondischargeable under § 523(a)."[113]

Here, the existence of the debt—and the amount thereof—is established by the jury verdict and judgment of the U.S. District Court in the Oklahoma case.[114] Only the second step—the nondischargeability of that debt—remains for decision by this Court. This adversary proceeding was not an opportunity for Defendant to retry or appeal the judgment of the Oklahoma case. The key issue for decision on Plaintiffs' complaint, therefore, is whether the debt reflected by the judgment entered in the Oklahoma case for the Kansas tort of outrage stems from a willful and malicious injury and is therefore nondischargeable under § 523(a)(6).

---

[111] 28 U.S.C. § 1334(b) and § 157(I) (a determination "as to the dischargeability of particular debts" is a core proceeding).

[112] *Glencove Holdings, LLC v. Bloom (In re Bloom)*, 634 B.R. 559, 579 (10th Cir. BAP 2021).

[113] *Id.*

[114] *Klemens v. Wallace (In re Wallace)*, 840 F.2d 762, 764 (10th Cir. 1988) ("Although the bankruptcy court in a dischargeability action under section 523(a) ultimately determines whether or not a debt is dischargeable, we believe that the doctrine of collateral estoppel may be invoked to bar relitigation of the factual issues underlying the determination of dischargeability."); *Sanders v. Crespin (In re Crespin)*, 551 B.R. 886, 899 (Bankr. D.N.M. 2016) ("[C]ourts have held that claim preclusion applies with respect to the claim on the debt in dischargeability proceedings but not to the claim of non-dischargeability of the debt."); *see also* Adv. No. 22-5015 (Bankr. D. Kan.), Doc. 47 (discussing preclusion principle as applied to the Oklahoma case).

22

2.	*Preliminary Matter – Admission of "Dramatic Incidents" Outline and Consideration of Oklahoma Case Exhibits*

As a preliminary matter, the Court must first address the admissibility of a proffered exhibit at trial in this Court. During Lea Ann's testimony, she offered into evidence an outline that had been prepared in the Oklahoma case titled "Dramatic Incidents," that constituted a demonstrative timeline of the factual allegations supporting Acosta's alleged torts against Plaintiffs.[115]

At the final pretrial conference, the Court instructed the parties on trial procedure. Again, the Court indicated it would take judicial notice of the trial transcript and the admitted exhibits from the Oklahoma case, and the entire "court record resulting from the Oklahoma case."[116] All parties indicated no other exhibits would be presented, and the Court ruled that no other exhibits would be permitted at trial.[117] A final pretrial order was entered accordingly.[118]

The outline offered by Lea Ann at trial was a demonstrative exhibit from the Oklahoma case that was attached to Plaintiffs' brief regarding their desired jury instructions. Acosta objected to admission of the exhibit at this trial, arguing that because the outline was not admitted in the Oklahoma case, it should not be admitted here. The Court took the objection under advisement.

---

[115]	Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 73-1.

[116]	*Id.*, Doc. 71 p. 2 (June 9, 2023 final pretrial conference).

[117]	*Id.* ("No new exhibits were identified by any party and no other exhibits will be allowed other than the Oklahoma trial exhibits, which are subject to objections by the parties at trial.").

[118]	*Id.*, Doc. 79 (final pretrial order).

23

The Court sustains Defendant's objection. The outline in question was not admitted into evidence or presented to the jury in Oklahoma. Plaintiffs did not identify or exchange this proffered exhibit before trial. The Court therefore sustains Acosta's objection to its admission.

The Court admits into evidence in this Court the trial exhibits cited in the recitation of facts, above. Specifically, the Court admits Exhibits 24 through 31 and Exhibit 101 from the Oklahoma case. These exhibits were referenced by Michael in his presentation of testimony to this Court, and the Court relies on them.

### 3. Nondischargeability Generally

Because bankruptcy's central purpose is to provide the honest debtor with a fresh start,[119] the exceptions to discharge should be narrowly construed, with doubts being resolved in the debtor's favor.[120] A creditor bears the burden of proof on a complaint to declare a debt nondischargeable by a preponderance of the evidence.[121] The standard is *not* beyond a reasonable doubt as Acosta argued at trial. Acosta could not point the Court to any authority suggesting such a standard, and the Supreme Court has long settled the issue. In *Grogan v. Garner*, the Supreme Court expressly considered the issue of the appropriate standard of proof

---

[119] *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 366 (2007) (quoting *Grogan v. Garner*, 498 U.S. 279, 286, 587 (1991)).

[120] *DSC Nat'l Props., LLC v. Johnson (In re Johnson)*, 477 B.R. 156, 168 (10th Cir. BAP 2012).

[121] *Grogan*, 498 U.S. at 287 (concluding "Congress intended the preponderance standard to apply to the discharge exceptions").

24

governing nondischargeability actions.[122] In rejecting the "clear and convincing" standard of proof, the Supreme Court stated:

> The statutory provisions governing nondischargeability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts—such as child support, alimony, and certain unpaid educational loans and taxes, as well as liabilities for fraud. Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start. We think it unlikely that Congress, in fashioning the standard of proof that governs the applicability of these provisions, would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud. Requiring the creditor to establish by a preponderance of the evidence that his claim is not dischargeable reflects a fair balance between these conflicting interests.[123]

Likewise, there is no basis for departing from the preponderance of the evidence standard in this case.[124]

### 4. The "Willful and Malicious Injury" Requirement of § 523(a)(6)

As noted, Plaintiffs seek to have their debt declared nondischargeable under subsection (a)(6) of § 523. That subsection states: "A discharge . . . does not discharge an individual debtor from any debt-- . . . (6) for willful and malicious injury by the debtor to another." Section 523(a)(6) prevents a debtor from

---

[122] *Id.* at 286-88.

[123] *Id.* at 287.

[124] *E.g.*, *Via Christi Reg'l Med. Ctr. v. Englehart (In re Englehart)*, No. 99-3339, 2000 WL 1275614, at *1 (10th Cir. Sept. 8, 2000) ("Under § 523(a)(6) . . . [t]he burden of proving such intent, by a preponderance of the evidence, rests on the creditor asserting nondischargeability."); *Dorr, Bentley & Pecha v. Pasek (In re Pasek)*, 983 F.2d 1524, 1526 (10th Cir. 1993) ("Under § 523(a)(6), the creditor firm had the burden to prove by a preponderance of the evidence that the debt was nondischargeable."); *see also Johnson v. Smith (In re Johnson)*, 501 F.3d 1163 1171-72 (10th Cir. 2007) (discussing burden of proof analysis from *Grogan v. Garner* and applying the preponderance of the evidence burden to finding "willful" under § 362(k)(1) after rejecting a higher burden of proof).

discharging debts that arise from intentional torts.[125] Negligent or reckless conduct is insufficient.[126]

The Tenth Circuit has not explicitly addressed whether the "willful and malicious injury" requirement of § 523(a)(6) is a unitary standard or separate prongs, although the Tenth Circuit has stated that proof of both a willful act and a malicious injury are required to establish a § 523(a)(6) claim.[127] With this guidance, the Tenth Circuit Bankruptcy Appellate Panel (BAP) opined: "Analyzing and applying 'willful' and 'malicious' separately is the better approach. It facilitates a more rigorous examination of what is required to satisfy the requirements of § 523(a)(6) and is consistent with most of the caselaw."[128]

---

[125] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) ("[T]he (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts.").

[126] *Id.* at 64 ("Negligent or reckless acts, the Court held, do not suffice to establish that a resulting injury is 'willful and malicious.'").

[127] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004) ("The district court overlooked the criticality of the terms 'willful' act and 'malicious injury' in § 523(a)(6). Without proof of *both*, an objection to discharge under that section must fail.").

[128] *First Am. Title Ins. Co. v. Smith (In re Smith)*, 618 B.R. 901, 912 (10th Cir. BAP 2020).
    The Eighth Circuit uses a similar test as the Tenth Circuit BAP, requiring the creditor to establish nondischargeability under § 523(a)(6) to "show by a preponderance of the evidence that the debt is for both 'willful . . . injury' and 'malicious injury." *Blocker v. Patch (In re Patch)*, 526 F.3d 1176, 1180 (8th Cir. 2008). Likewise, the Ninth Circuit separates the willfulness requirement of § 523(a)(6) from the malicious injury requirement. *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146 (9th Cir. 2002) (citing *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001)).
    The Fifth Circuit, by contrast, uses a single inquiry test. Its test "is condensed into a single inquiry of whether there exists either an object substantial certainty of harm or a subjective motive to cause harm on the part of the debtor." *Williams v. Int'l Bhd. of Elec. Workers Local 520 (In re Williams)*, 337 F.3d 504, 509 (5th Cir. 2003) (internal quotation omitted).
    In the Seventh Circuit, Judge Posner surveyed the circuits' varying interpretations of § 523(a)(6), ultimately adopting a test most similar to the dual prongs. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 322-23 (7th Cir. 2012) (calling the differing standards a "pseudo-conflict," as the "different legal definitions of the same [§ 523(a)(6)] statutory language . . . probably don't generate different outcomes").

Here, the Court will employ the dual prong approach adopted by the Tenth Circuit BAP, applying the more rigorous examination to provide fair consideration to the seriousness of carving out an exception to the principal purpose of bankruptcy. To prevail under § 523(a)(6), therefore, Plaintiffs must prove both a willful and a malicious injury.

5.    *Willful Injury*

"For an injury to be 'willful,' there must be a deliberate or intentional injury, not merely 'a deliberate or intentional act that leads to injury.'"[129] Of course, "direct evidence that the debtor acted with the specific intent to harm a creditor or the creditor's property" is sufficient to prove a willful injury.[130] But direct evidence of a specific intent to harm is rare, and a willful injury may also be proven with "indirect evidence that the debtor desired to cause the injury or believed the injury was substantially certain to occur." The analysis of a willful injury is a subjective standard as applied to this proceeding.[131]

The Court is firmly persuaded that all of the incidents collectively establish that Acosta intended to cause each Plaintiff harm at the time the harm was inflicted.

Even without testimony—either from the Oklahoma case or in this Court— the established facts show not one or even two, but three Protection from Stalking Orders entered by the Kansas courts. Each order was entered after a conclusion

---

[129] *In re Smith*, 618 B.R. at 912 (quoting *Kawaauhau*, 523 U.S. at 57).
[130] *Id.*
[131] *Id.*

27

that Lea Ann, then Lea Ann and the children, then all Plaintiffs, had proven "intentional harassment of another person that places the other person in reasonable fear for that person's safety" by a preponderance of the evidence.[132] Each order specifically ordered Acosta to cease all contact.[133] Stalking and harassment are intentional acts that are not accidental—especially when the behavior is repeated, as by this Defendant for fourteen years.

Not only did the Kansas courts conclude three times that stalking was proven by a preponderance of the evidence, but then a permanent injunction was entered by the court in the Oklahoma case. That federal district judge concluded Acosta had engaged in a "campaign of harassment" against Plaintiffs.[134]

When this Court adds to these findings the testimony and other evidence from the Oklahoma case, and then the testimony added in the trial of this adversary proceeding, the pattern of Acosta's behavior leads to the inescapable conclusion that his actions were deliberate attempts to cause injury. The Court heard credible and tearful testimony from Lea Ann, Michael, Hayden, and Abbigail about fourteen years of Acosta's inexcusable and intentional behavior. In Oklahoma, Plaintiffs also testified to years of actions that might accidentally occur once or twice, but not dozens or hundreds of times over such a long period of time without being intentional.

---

[132] Kan. Stat. Ann. § 60-31a02.
[133] Further, under Kan. Stat. Ann. § 21-5427(c), after a protective order is entered, a person "shall be presumed to have acted knowingly as to any like future act targeted at the specific person or persons named in the order."
[134] Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 96 (order); also at *Lavielle v. Acosta*, 281 F. Supp. 3d 1133 (W.D. Okla. 2017).

28

Neither the Oklahoma case, nor the trial in this Court, contained any believable evidence that the continuous, harassing contacts between Defendant and Plaintiffs over the many years were accidental or at the instigation of Plaintiffs. The trial testimony, both at this Court and in the Oklahoma case, showed a pattern of behavior that forces a conclusion Acosta acted willfully; he wanted to harm Plaintiffs.[135]

It is clear Acosta did not just intend to repeatedly chase Plaintiffs in his vehicle, or wave a knife at them, or make threatening phone calls, or take any of the numerous other vile, threatening and obsessive actions he took against the Lavielles for years. Rather, he intended the *consequences* of his behavior: to cause emotional and financial harm to Plaintiffs—all for no apparent reason other than his enjoyment.[136] The willful element of Plaintiff's proof has been satisfied.

6.  *Malicious Injury*

Plaintiffs also have the burden to prove a malicious injury under § 523(a)(6). "For an injury to be 'malicious,' 'evidence of the debtor's motives, including any claimed justification or excuse, must be examined to determine whether the

---

[135]  See Restatement (Second) of Torts § 8A ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it.").
[136]  *See, e.g.*, *Harris v. Kamps (In re Kamps)*, 575 B.R. 62, 82 (Bankr. E.D. Pa. 2017) (addressing a § 523(a)(6) claim with respect to text messages that "were incredibly vile, threatening, and offensive," and concluding: "Given their heinous content, it is incomprehensible that the Debtor could have sent, or conspired to send, the Texts without intending to injure Harris. At the very least, the Debtor must have known with substantial certainty that Harris would be injured by the Texts. The Court therefore concludes that the Debtor sent the Texts with the intent of injuring Harris, and that this is sufficient to constitute a willful injury under § 523(a)(6).").

29

requisite 'malice' in addition to 'willfulness' is present.'"[137] Malicious behavior is both intentional and wrongful.[138] Plaintiffs must show that Acosta acted with a culpable state of mind vis-à-vis the actual injury.[139] In other words, the totality of the circumstances—"all surrounding circumstances"[140]—must show that Acosta acted with a wrongful state of mind. Acosta has the burden to present any justification or excuse, although Plaintiffs maintain the burden to demonstrate that the presented justification or excuse do not absolve Acosta's behavior.[141]

The Court finds Plaintiffs have met their burden and have proven malicious injury. All of Acosta's actions, taken together, demonstrate Acosta acted with a wrongful state of mind to inflict harm on Plaintiffs. None of the antagonistic actions Acosta took were isolated, or accidental. Section 523(a)(6) usually applies to single occurrences—an "injury." Acosta's continuous behavior directed at the Plaintiffs over more than a decade, including a multitude of interactions with law enforcement and the courts, clearly demonstrates malice, in addition to intent. If Acosta's behavior was not malicious, it is difficult to imagine what would be sufficient to satisfy § 523(a)(6).

---

[137] *In re Smith*, 618 B.R. at 919 (quoting *Dorr, Bentley & Pecha v. Pasek (In re Pasek)*, 983 F.2d 1524, 1527 (10th Cir. 1993)).

[138] *Nelson v. Bolles (In re Bolles)*, 593 B.R. 832, 843 (Bankr. D.N.M. 2018) ("[F]or a debtor's actions to be malicious, it must be intentional, wrongful, and done without justification or excuse.").

[139] *See In re Pasek*, 983 F.2d at 1527 ("[A]ll the surrounding circumstances, including any justification or excuse offered by the debtor, are relevant to determine whether the debtor acted with a culpable state of mind vis-a-vis the actual injury caused the creditor.").

[140] *Id.*

[141] *In re Smith*, 618 B.R. at 921.

30

Notably, Acosta offered no justification or excuse for his actions other than denying the actions occurred or trying to flip the script and claim the Plaintiffs were actually chasing and harassing him continuously for fourteen years. Throughout the Oklahoma case and in this Court, Acosta's arguments were unconvincing and inconsistent with the behavior of a misunderstood and innocent victim. Acosta argued in Oklahoma that Plaintiffs were lying, the children had been coached, and it was Lea Ann who loved the drama of their interactions. Other than simply making such accusations, he offered no substantive evidence in support of such claims. The Oklahoma jury obviously did not believe him.

Neither does this Court. It finds the testifying Plaintiffs to each be extremely credible witnesses—there was no hesitation in their testimony, and each spoke knowledgeably and carefully about what occurred. A person who was not intending the consequences of the innumerable, horrible actions Acosta took against the Plaintiffs could avoid the vast majority of them by simply avoiding the Plaintiffs, as he had been ordered to do by the courts. He chose to repeatedly engage for fourteen years. He argued the allegations against him were not proven, but the procedural history in the courts and the overwhelming volume of credible and persuasive evidence from two trials left this Court with absolutely no doubt that the debt at issue here resulted from Mr. Acosta's willful and malicious injury. [142]

---

[142] *See In re Bolles*, 593 B.R. at 844 (concluding the debtor's "actions were contemptible and malicious," where the debtor lied to his partner about not having an incurable sexually transmitted disease); *see also Stennis v. Davis (In re Davis)*, 486 B.R. 182, 190 (Bankr. N.D. Cal. 2013) (concluding a jury verdict of outrageous conduct—intentional infliction of emotional distress—necessarily established the wrongful act).

7.    *Damages*

At trial in this Court, Acosta argued Plaintiffs had not proven that the totality of the damages awarded by the jury in the Oklahoma case stemmed from willful and malicious injury. As the Court noted above, the amount of the debt was established by the jury in the Oklahoma case. As the Court repeatedly attempted to impress on Defendant, it is not this Court' role in this adversary proceeding to revisit the underlying computation of damages from the Oklahoma case. It is instead this Court's function to decide what portion of that debt awarded in the Oklahoma case, if any, stems from a willful and malicious injury to each Plaintiff.[143]

In the Oklahoma case, each Plaintiff was awarded $20,000 in noneconomic losses and $32,000 in punitive damages. Michael was also awarded $40,000 in past economic loss. The jury concluded this was the amount Plaintiffs were harmed by Acosta's tortious conduct.

Each of the testifying Plaintiffs addressed the harms caused them by Acosta. The noneconomic losses awarded each Plaintiff are the emotional and mental injuries—the jury instructions defined noneconomic loss as "pain, suffering, disabilities, disfigurement and any accompanying mental anguish suffered as a result of the party's injuries to date and the noneconomic loss that party is reasonably expected to suffer in the future."[144] The punitive damages were awarded

---

[143] *See Swan Pediatric Dental, LLC v. Hulse (In re Hulse)*, No. UT-22-001, 2022 WL 16826561, at *10 (10th Cir. BAP Nov. 8, 2022) ("There are two steps in a nondischargeability proceeding. Is there a debt arising from the "prohibited" acts listed in § 523(a)? If yes, what is the amount of the debt stemming from those acts?").

[144]  Civil Case No. 5:16-cv-01002-R (W.D. Okla.), Doc. 80 p. 22.

32

to "punish" Acosta.[145] The jury concluded Plaintiffs had proven, by clear and convincing evidence, that Acosta acted "in a willful, wanton, or malicious manner" toward them.[146] Michael's sole receipt of economic damages,[147] an award of $40,000 for the loss of business, relocation expenses, and the cost of maintaining two homes, makes sense, because the family experienced those particular losses jointly.

Many of the admitted exhibits in the Oklahoma case were disturbing in nature, including obscene and violent comments and gruesome photos from Defendant's Facebook page. The contents of many of these exhibits were summarized in portions of Exhibit 101, the expert report of Dr. Poyner.[148] This Court does not rely on the report for any evaluation it purports to make about the nature of stalkers or of Acosta's personality traits. The Court does find the portions of the report documenting and describing the noneconomic suffering of the Plaintiffs to be relevant and consistent with the Court's conclusion below about the extent of the damages that were the result of the willful and malicious conduct of Acosta. The Court would reach the same conclusion, however, even if it had not reviewed this exhibit.

The Court concludes the full amounts awarded by the jury in the Oklahoma case are nondischargeable as stemming from willful and malicious injury under §

---

[145] *Id.* p. 23.
[146] *Id.*
[147] The jury instructions defined economic loss as "loss of time or income and losses other than medical expenses incurred as a result of the party's injuries." *Id.* p. 22.
[148] *Id.*, Trial Exh. 101. Like the other Oklahoma case trial exhibits, this exhibit was admitted in the Oklahoma case without objection, and Defendant did not object to its consideration in this case.

33

523(a)(6). Each portion of the damages awarded stems from Acosta's specific intent to injure Plaintiffs with his malicious actions: both the compensatory damages and the punitive damages.[149] None of this was simply reckless behavior on Defendant's part. There is no portion of the debt owed Plaintiffs by Acosta that can or should be excised from the prohibited acts of § 523(a)(6). It is possible Acosta did not intend to cause "the precise magnitude of the injuries sustained."[150] But the Court has concluded herein that Plaintiffs carried their burden to prove Acosta intended the injuries, so even if he did not intend to cause the full scope of the harm, that is irrelevant to the analysis.

### E.    Conclusion

The Court sustains Defendant's objection to the admission of the Dramatic Incidents Outline and admits into evidence Exhibits 24 through 31 and Exhibit 101 from the Oklahoma case.

As with many disputes about the nondischargeability of debt, the credibility of witnesses was a key component in this proceeding. Plaintiffs carried their burden to prove both willfulness and maliciousness. After carefully weighing the evidence

---

[149]  *See Berrien v. Van Vuuren*, No. 07-1294, 2008 WL 2275928, at *4 (10th Cir. June 4, 2008) (affirming damages for emotional distress and compensatory expenses and a judgment of nondischargeability for willful and malicious injury under § 523(a)(6) stemming from a fabricated hit and run accident leading to false criminal charges); *Aspect Tech. v. Simpson (In re Simpson)*, Nos. EO-97-050, 96-71952, 97-7009, 1998 WL 296331, at *4 (10th Cir. BAP June 8, 1998) (addressing Supreme Court's decision in *Cohen v. de la Cruz*, 523 U.S. 213 (1998), and stating "treble or punitive damages are dischargeable if the underlying compensatory damages are dischargeable").

[150]  *E.g.*, *State Farm Fire & Cas. Co. v. Edie (In re Edie)*, 314 B.R. 6, 17 (Bankr. D. Utah 2004) ("The crucial question is whether [the debtor] intended, or expected, to cause injury to [the creditor's] property, not whether she intended to cause the precise magnitude of injuries sustained.").

34

and observing each testifying witness, and after reviewing the lengthy procedural history between these parties, the Court concludes Defendant acted with the specific intent to injure Plaintiffs, with a wrongful state of mind, and without just cause or excuse. The Court will therefore enter judgment for Plaintiffs on their complaint, declaring that the totality of the debt owed to them pursuant to the Oklahoma judgment is nondischargeable under § 523(a)(6).[151]

### #

---

[151] *Cohen v. de la Cruz*, 523 U.S. 218, 218-21 (1998) (concluding that once it has been established that a debt is nondischargeable under § 523(a)(2)(A), then "any debt" arising therefrom is also nondischargeable); *MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42, 55 (Bankr. D. Colo. 2014) (citing cases supporting conclusion that once a debt has been found nondischargeable under § 523(a), all ancillary obligations to that debt such as fees and interest are also nondischargeable).

35